IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| HARRY SCHMIDT and COLLEEN SCHMIDT, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 140134C |
| v. | ) ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered

February 4, 2015. The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appeal the real market value of property identified as Account 00131075

(subject property) for the 2011-12, 2012-13, and 2013-14 tax years. (Ptfs' Compl at 1; Ptfs' Am

Compl at 1.)

A trial was held in the Oregon Tax Courtroom on October 8, 2014, in Salem, Oregon.

W. Scott Phinney (Phinney), an Oregon Registered Appraiser, represented Plaintiffs. Phinney

also testified for Plaintiffs at trial. Todd Cooper (Cooper), a Registered Appraiser with the

Clackamas County Assessor's office, appeared and testified on behalf of Defendant. Plaintiffs'

Exhibit 1 was received without objection. Defendant's Exhibits A through J and M were

received without objection.

I. STATEMENT OF FACTS

A. *The Subject Property*

The parties agree generally on the basic physical characteristics of the property under

appeal (size, quality and condition). (*see e.g.*, Ptfs' Ex 1 at 13-15; Def's Ex A at 4.) The subject

property is a 5,702 square foot, good quality home on 5.76 acres in Damascus, Oregon. (Ptfs' Ex 1 at 6; Def's Ex A at 3.) The home was built in 1997, with at least one remodel or addition in 2001. (Ptfs' Ex 1 at 6; Def's Ex A at 3, 5.) The zoning in the area of the subject property is RRFF5 (rural residential, farm/forest, with a minimum five acre requirement to build). (Ptfs' Ex 1 at 4, 7-8.)

The home has a total of 5,702 square feet of finished living space; 3,167 square feet is above grade, or on the main floor, and 2,535 square feet is finished basement living area. (Ptfs' Ex 1 at 6; Def's Ex A at 3, 5.) The home has four bedrooms, three full baths and two half baths. (*Id*.) The home has an attached garage. In their comparative sales analyses, Plaintiffs describe the garage simply as a three-car garage, while Defendant indicates that the garage is 866 square feet in size and "has room for 3-4 cars." (Ptfs' Ex 1 at 13-15; Def's Ex A at 3-4.)

Additional amenities directly associated with the home include a 50-year composition roof, stucco siding, wood decks, multiple concrete patios and ornamental copper downspouts. (Ptfs' Ex 1 at 6; Def's Ex A at 3.) The parties further agree that the home's additional interior features include granite tile kitchen counters, marble and hardwood floors, good or high quality kitchen appliances, two gas fireplaces, and a free-standing gas stove. (Ptfs' Ex 1 at 6; Def's Ex A at 3.)

The subject property also has an in-ground pool, a pool house, a large shop, a barn with an attached lean-to, and a tennis court. (Ptfs' Ex 1 at 6; Def's Ex A at 3, 8.) Defendant's appraisal report indicates that the pool includes a "pool house and full bath, multiple outbuildings, a fenced tennis court and full landscaping." (Def's Ex A at 3.) Plaintiffs did not challenge that description, and their written opinion of value includes some of that information. (Ptfs' Ex 1 at 6.) According to Defendant, "The tennis court is 24 x 70 [feet] with asphalt

paving, full chain link perimeter fencing and a built-in net assembly." (*See* Def's Ex A at 3.) Plaintiffs did not challenge that description of the tennis court, and the court accepts it as fact. Defendant's report further stated that "[t]he outbuildings consist of a 60 x 68 [foot] steel frame shop with concrete floor, full electrical, 144 square foot finished office, full bath and a 30 x 12 [foot] outbuilding. (*Id.*) The barn structure is 20 x 40 [feet] with an attached 20 x 20 [foot] machine shed and a 50 x 10 [foot] lean to." (*Id.*)

Defendant submitted photographs of the subject property depicting the pool, pool house, barn, shop, tennis court, and photos of the home's interior amply depicting the quality and condition of the home, including the living room, dining room, kitchen, family room, master bedroom and master bath, den, recreation room, wet bar, wine room, and guest bathroom. (Def's Ex A at 15-22.) Those photographs show the marble, tile, and granite, as well as dark wood accents and specialty lighting. (*Id*. at 16-19.)

Phinney testified that the property's location as "out in the middle of nowhere, about three miles off Highway 212." In his report, Cooper describes the neighborhood as "comprised mainly of single family homes built from 1960 to 1996 with average to good overall quality. Small commercial, light industrial and multi-family uses are present in the subject neighborhood, but make up less than 10% of the total land use." (Def's Ex A at 3.) Cooper stated in his report that "[e]mployment opportunities, public transportation, shopping and additional public amenities are located in close proximity to the subject." (*Id*.)

B.      *Tax Roll Values and the Parties' Value Requests*

The real market value on the assessment and tax rolls for the years at issue is $699,791 for the 2011-12 tax year, $648,517 for the 2012-13 tax year, and $704,868 for the 2013-14 tax year. (Ptfs' tax statements, filed Apr 23, 2014; Ptfs' Compl at 2.)

Plaintiffs originally requested a real market value of $525,000 for each of the three tax years under appeal. (Ptfs' Compl at 1.) Plaintiffs filed an Amended Complaint requesting real market values of $470,000, $500,000, and $525,000, respectively, for tax years 2011-12, 2012-13, and 2013-14. (Ptfs' Am Compl at 1.) Plaintiffs again revised their request at trial, based on a written opinion of value, to $460,000, $520,000, and $490,000, respectively, for the three tax years at issue. (Ptfs' Ex 1 at 12.)

Defendant requested at trial that the court sustain the values on the roll for tax years 2011-12 and 2013-14, and that the court dismiss Plaintiffs' appeal for the 2012-13 tax year because it does not meet the 20 percent statutory threshold requirement under ORS 305.288. A dismissal of the 2012-13 tax year would have the effect of sustaining the values currently on the roll for that tax year.

C.      *Plaintiffs' Evidence and Appraisal*

1.      *General Overview and the Approaches to Value Considered and Used*

Plaintiffs submitted a summary format appraisal "with support coming from work files not included in the report." (Ptfs' Ex 1 at 8.) Phinney states in his report that he considered the three standard approaches to value (cost, income, and comparable sales), but that, due to the "age and type of * * * property" being appraised, the cost approach was deemed unreliable and therefore not used because there was a "distressed market for residential properties during the time period at issue," and "significant subjective adjustment[s] for economic obsolescence" would need to be made. His report also indicates that "typical buyers for this type of property do not rely on the cost approach." (*Id*. at 8-9.) Phinney also rejected the income approach because the subject property "is not income producing." (*Id*. at 9.) Phinney therefore relied solely on the comparable sales approach. (*Id*.)

2.       *The Subject Property, Factors Influencing Selection of Comparables, and Market Conditions*

During his testimony, Phinney described the subject property as a very good quality, large home, in the middle of nowhere, about three miles off Highway 212." Phinney further testified that the "big issue" in this case is the size of the subject property - a home in excess of 5,600 square feet. Phinney testified that it was important to select comparable sales that were similar in size, located in the same market area, which he determined to be Multiple Listing Service (MLS) area 145, and that sold within the window six months before to six months after the applicable assessment date for each tax year (thus bracketing the assessment date). According to Plaintiffs' evidence, MLS area 145 encompasses Milwaukie and Clackamas. (Ptfs' Ex 1 at 28-31.) Phinney explained during his presentation of Plaintiffs' case in chief that during calendar year 2013, MLS areas 143, 144, and 145 had sales price percentage changes of 18.1 percent (MLS area 143), 14.4 percent (MLS area 144), and 13.2 percent (MLS area 145). Phinney then testified that that data, which represents market conditions in 2013, explains why he chose only comparables for market area 145. (*Id*. at 28.) However, all of Phinney's comparable sales are of properties in the town of Damascus, which is where the subject property is located. (Ptfs' Ex 1 at 13-15.)

Phinney further testified that the location of the subject property made the home "unique." Phinney testified that he considered the size of the lot to be another important factor in this case in terms of the selection of comparable sales.

Phinney further testified that, in his professional opinion, the real estate market "crash" in 2007 continued into 2012, and is possibly still going on "today." That market phenomenon, Phinney testified, diminished the market and made it hard to find comparable sales. Phinney testified that adjustments had to be made through "market extraction" and "cost factors," but not

costs from the Department of Revenue manual. He further testified that paired sales were not possible. For each assessment year, Phinney selected the four best sales from his comparable sales search criteria discussed above.

3.     *Comparables Selected and Types of Adjustments Made*

Phinney used four comparable sales for each of the three tax years at issue. (Ptfs' Ex 1 at 13-15.) The court will focus its analysis on tax years 2011-12 and the 2013-14 because Phinney acknowledged that his value estimate for the 2012-13 tax year did not result in an alleged error of at least 20 percent, which is a statutory requirement for both the 2011-12 and 2012-13 tax years, as explained below.[1]

Phinney testified that all of his comparable sales are in the town of Damascus and are within five miles of the subject property. His appraisal report substantiates that fact. (*Id*.) Phinney considered a host of factors for the adjustments he made to his comparable sales. Phinney adjusted for date of sale, sale type (short sales and the bank-owned properties, of which there were three), lot size, location, year built, quality, condition, and above grade versus below grade finished and unfinished living space, number of spaces in the garage, number of bathrooms and bedrooms, HVAC (heating, ventilation, air conditioning), fireplaces, view, and "outdoor features[.]" (Ptfs' Ex 1 at 10-11.) Plaintiffs' most significant adjustments, in terms of dollars, were for sale type, lot size, "area," which boiled down to whether the comparable was located in a gated community or not (Phinney giving a negative $50,000 adjustment for homes in a gated community), size of the homes, year built and view. (*Id*. at 13, 15.)

/ / /

---

[1] Although Phinney's appraisal includes valuation evidence for the 2012-13 tax year, the court finds it unnecessary to discuss Plaintiffs' evidence for that tax year because Plaintiffs have failed to meet the 20 percent statutory threshold for prior year appeals required by ORS 305.288(1)(b), and addressed in the Analysis section of the court's Decision.

4. *Tax Year 2011-12*

Phinney's unadjusted sale prices for his four comparables used for the 2011-12 tax year were $550,000, $525,000, $447,500, and of $335,000. (Ptfs' Ex 1 at 13.) Those sales are comparables 1 through 4, respectively. (*Id.*) Phinney's net adjustments for those four comparables were $11,480, negative $68,213, $12,073, and $109,020, respectively. (*Id.*) His adjusted values for the 2011-12 tax year were $561,480, $456,788, $459,573, and $444,020. (*Id.*) Phinney testified that his comparable sales one and three had small net adjustments (unlike comparable sales 2 and 4), but that comparable 1 had a second home, therefore, comparable 3 was the "best" comparable for 2011. Phinney's appraisal aligns with his testimony, indicating that comparable sale number 3 "is the best indication of value" as of January 1, 2011 (2011-12 tax year). (*Id.* at 11.) That property sold for $447,500, is located three miles from the subject, sits on a 0.69 acre lot (compared to the subject's 5.76 acre lot), is 760 square feet smaller than the subject, and was a bank sale that was on the market for 45 days, leading the appraiser to apply a positive adjustment of $22,375 to account for the bank influence. (*Id.* at 13, 18.) Phinney's comparable 1, the other sale he used that had small overall (net) adjustments, sold for $550,000, and with net adjustments of $11,480, had an adjusted sale price of $561,480. (*Id.* at 13.) Based on the conclusion that sale 3 was his best comparable, Phinney estimated the value of the subject property for tax year 2011-12 to be $460,000 ($427 more than the adjusted sale price of Phinney's comparable sale 3). (*Id.* at 11, 12.)

5. *Tax Year 2013-14*

For the 2013-14 tax year, Phinney's four comparables sold for $572,000, $459,900, $509,000, and a $540,000, respectively. (Ptfs' Ex 1 at 15.) Phinney's net adjustments were a negative $83,761, negative $102, $45,830, and negative $5,505, respectively, for comparables 1

through 4. (*Id.*) His adjusted values for his comparables 1 through 4 are $488,239, $459,798, $554,830, and $534,495. (*Id.*) One of the four comparable sales (comparable 1) was a bank sale. Three of the four properties are on acreages relatively similar to the subject property's 5.76 acres (4.76 acres, 4.6 acres, and 5.95 acres, respectively, for sales 1, 2, and 4). (*Id.*) Two of the four sales (comparables 2 and 4) are located within a half mile or less from the subject property. (*Id.*) Phinney indicates in his appraisal that his comparables 2 and 4 are his "best indications of value." (*Id.* at 12.) Phinney acknowledges in his report that those comparables "create[] a wide range of value," with adjusted sale prices of $459,798 and $534,495. (*Id.* at 12, 15.) Phinney gave comparable 2 "slightly more weight," concluding that the subject property's "value as of January 1, 2013 is $490,000." (*Id.* at 12.) Comparable 2 sold on March 4, 2013, several months after the applicable assessment date. (*Id.* at 15.) The home is located on a 4.6 acre lot, was built in 2003, and has a total square footage very similar to the subject property (5,550 square feet for comparable 2 and 5,702 square feet for the subject property). (*Id.*) The subject property's total above grade finished living space is 3,167 square feet and Plaintiffs' comparable 2 has 3,250 square feet of above grade finished living space; the subject property has 2,535 square feet of below grade (or basement) finished space and comparable 2 has 2,300 square feet of finished below grade living space. (*Id.*)

D.    *Defendant's Evidence and Appraisal*

      1.    *General Overview and the Approaches to Value Considered and Used*

Cooper considered all three approaches to value in his "summary appraisal report," but utilized only the sales comparison and cost approaches, finding the income approach inappropriate because the subject property is not the type of property that generates income. (Def's Exs A at 9, D at 9, G at 9.) Cooper testified that, although he included a valuation using

the cost approach, he gave that approach little weight. According to both Cooper's testimony and his appraisal report, Defendant relied primarily on the sales comparison approach, which, according to his report, "was given the most consideration as it[] best represents the actions of buyers and sellers of similar properties in the current marketplace." (Def's Ex A at 14.)

2.     *Factors Influencing Selection of Comparables, and Market Conditions*

Cooper testified during his case in chief that he searched for larger homes on rural acreage properties in the towns of Boring, Damascus, and outer Sandy. Cooper testified that, over his 20-plus years of residential appraiser experience as a licensed and certified appraiser in Oregon and Washington, he has appraised "hundreds of properties in that area[,]" and that he owned a home one quarter mile away from the subject property.[2] Cooper testified that buyers do not ask to see homes that are in MLS area 145, or the town of Damascus, as Phinney contended. Rather, as stated above, prospective buyers of homes similar to the subject property are looking for rural acreage properties with larger homes in and around Damascus. Cooper testified on cross-examination that important factors to be considered in selecting comparable sales are the market area, which he described as the "primary factor," the size of the home based on above grade square footage, and the size of the property, testifying that it was important that the comparables selected were on "acreage[.]"

Cooper testified that the parties disagree on what the market was doing. Cooper states in his report that, for the 2011-12 tax year, "[t]he subject market (as of the effective date of appraisal) was slow with a decline in property values over the twelve months prior. * * * The decline was a result of an oversupply of inventory, decreased demand and increased difficulty in

_____

[2] Cooper's appraiser qualifications appear in Defendant's Exhibit A at 25. Cooper began as a registered assistant appraiser in Oregon in 1992, was licensed in Oregon and Washington in 1994, and certified in both states in 2006.

obtaining buyer financing." (Def's Ex A at 3.) Cooper determined that property values "were generally stable" for the 12 months prior to tax years 2012-13 and 2013-14. (Def's Exs D at 3, G at 3.)

      3.     *Comparables Selected and Types of Adjustments Made*

Cooper relied on a total of 18 sales he deemed comparable to the subject property in his comparable sales approach, six for each tax year. (Def's Ex A at 4, D at 4, G at 4.) Cooper testified that, of the 18 sales, one was a "short sale," and another a "bank sale." (*see also* Def's Ex D at 9). Cooper testified that he made a $53,600 upward adjustment (9 percent) to his bank sale, which is his comparable 4 for the 2012-13 tax year. (Def's Ex D at 4, 9.) Cooper acknowledged on cross-examination that he made no adjustment to his comparable 2 (also for the 2012-13 tax year), because it was, in Cooper's opinion, not a "typical" short sale. However, because the 2012-13 tax year is being dismissed for lack of jurisdiction (see Analysis below), the court will limit any discussion of Defendant's value evidence for that year to minimal relevant references.

Cooper also made adjustments for differences between the subject property and his comparable sales that were "derived from the market using paired sales analysis and extraction techniques [which] are supported by the local RMLS statistics, local cost guides, personal data banks and conversations with professionals deemed a knowledgeable in this area." (Def's Exs A at 7, G at 7.) Those adjustments included date of sale, lot size, neighborhood, quality, year built (age), condition, square footage of the home (above and below grade), differences in the garage area, number of bathrooms, and exterior amenities (*e.g.*, swimming pool, pool house, shops, barns, tennis courts). (Def's Exs A at 4, 7-8; G at 4, 7-8.)

/ / /

4. *Cost Approach*

For his cost approach, Cooper determined a land value based on "land valuation studies of the subject area by the [assessor's] office[,]" and construction costs "from the Oregon Department of Revenue Cost Factor Book adjusted for location and time." (Def's Exs A at 9, G at 8-9.) Cooper notes in his report that "[t]he cost approach was the basis for the original valuation of the subject property for this assessment year [2011-12] and has been included in its report." (Def's Exs A at 14, G at 14.) Cooper goes on to note that "the recent inspection of the subject property resulted in a correction of the building sketch and outbuilding inventory changes [and that] [d]ue to the recent changes, the cost approach * * * is not felt to be the best indicator of market value and was given less consideration in the development of the market value estimate." (*Id.*) Cooper's value estimates under the cost approach for the three years at issue are $699,791 as of January 1, 2011, and $704,868 as of January 1, 2013. (*Id.*) Cooper's trial testimony focused almost entirely on the sales comparison approach, discussed immediately below.

5. *Comparable Sales Approach*

a. Tax Year 2011-12

Cooper used six comparable sales for each of the three tax years at issue. (Def's Exs A at 4, D at 4, G at 4.) Cooper's unadjusted sale prices for the 2011-12 tax year range from a low of $439,850 to a high of $950,000. (Def's Ex A at 4.) His sales for that year occurred between August 2010 (comparable 3) and June 2011 (comparable 6). (*Id.*) Cooper made adjustments for differences in acreage, year built, total above grade square footage, total basement square footage, square footage of the garage, number of bathrooms and fireplaces, and exterior amenities. (*Id.*) His net adjustments for the 2011-12 tax year were $125,000, $95,400,

$130,500, $58,100, $192,200, and negative $97,400, respectively, for comparables 1 through 6. (*Id*.) Cooper's adjusted sale prices for his six comparables were $685,000, $595,400, $715,500, $578,100, $632,050, and $852,600, respectively. (*Id*.) Cooper testified that his comparable 1 is located on the same street as the subject property, is of similar quality, condition, has more above grade square footage but no basement, and was an arm's-length sale. However, although the subject property has a total of 5,702 square feet of finished living space, with 3,167 square feet of above grade living space and 2,535 square feet of finished basement area, Cooper's comparable 1 has 3,279 square feet of total finished living space, all of which is above grade. (*Id*. at 3-4.) Cooper made a net adjustment to his comparable 1 for the difference in size of $43,400.[3]

> b.      Tax Year 2013-14

For the 2013-14 tax year, Cooper's unadjusted sale prices ranged from a low of $507,000 to a high of $730,000. (Def's Ex G at 4.) Cooper's sales occurred between June 2012 (comparable 5) and May 2013 (comparables 2 and 6). (*Id*.) Cooper made the same adjustments to his 2013-14 comparables that he did for his comparables for the two prior tax years. (*Id*.) His net adjustments were $142,500, $82,900, $32,100, $168,600, negative $22,325, and $75,185, respectively, for comparables 1 through 6. (*Id*.) Cooper's final adjusted sale prices were $692,000, $669,900, $647,000, $675,600, $707,675, and $700,185, respectively. (*Id*.) Cooper briefly testified to the adjusted value range of $647,000 to $707,675 and advised the court that his value estimate was $683,000 for the 2013-14 tax year. Cooper's appraisal report indicates that comparables 2, 3, 5 and 6 were "felt to be the best indicators of market value" because of

---

[3] Cooper made a negative $7,300 adjustment for the larger amount of above grade living space, and a positive adjustment of $50,700 for the 2,535 square feet enjoyed by the subject, but lacking in his comparable number one. (Def's Ex A at 4.)

their lower overall net adjustments.  (*Id*. at 8.)  Those four properties had adjusted sale prices of $669,900, $647,000, $707,675, and $700,185.  Those properties are located between approximately two and one half miles and five miles from the subject property.  (*Id*. at 4.)  None of those properties had below grade, or basement, living space, and total square footages are 3,074 square feet, 3,925 square feet, 4,872 square feet, and 4,038 square feet, respectively, for comparables 2, 3, 5 and 6.  (*Id*.)

## II.  ANALYSIS

The issue before the court is the real market value of the subject property for tax years 2011-12, 2012-13, and 2013-14.

A.    *Jurisdiction*

The court has jurisdiction to hear property tax valuation appeals for the "current tax year" under ORS 305.275(1)[4] provided the party is aggrieved and, under subsection (3), has appealed "from an order of the board [of property tax appeals] as a result of the appeal filed under ORS 309.100."

Plaintiffs' appeal for the 2013-14 tax year was timely filed from an order of the county board of property tax appeals.  The court therefore has jurisdiction to consider that tax year.

Plaintiffs' appeal for the 2011-12 and 2012-13 tax years was filed under ORS 305.288(1). The relevant provision in that statute requires that the taxpayer asserts, and the court determines, "that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent."

/ / /

---

[4] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2011.

Plaintiffs have alleged an error in the real market value of their property in excess of 20 percent for the 2011-12 tax year; they have not alleged an error of at least 20 percent for the 2012-13 tax year. The real market value on the rolls for the 2012-13 tax year is $648,517, and Plaintiffs have requested a real market value of $520,000. That allegation amounts to an alleged error of 19.8 percent. Although that number is close to the 20 percent statutory threshold, it must be at least 20 percent. Phinney acknowledged that during closing argument, adding that the statute would be satisfied if the court were to find that the evidence supported a slightly lower value than the $520,000 request. The evidence does not support such a finding, and more importantly, the statute makes the *allegation* of an error in value of at least 20 percent necessary for the court to order a change or reduction in value. ORS 305.288(1)(b). The pertinent language in the statute provides that "[t]he change or correction requested is a change in value * * * *and it is asserted in the request* and determined by the tax court that the difference between the real market value [of the property versus the] real market value on the assessment and tax roll * * * is equal to or greater than 20 percent." *Id*. (emphasis added).

B.      *Real Market Value and the Burden of Proof*

ORS 308.205(1) defines RMV in part as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment dates for the three years at issue are January 1, 2011, January 1, 2012, and January 1, 2013. ORS 308.007; ORS 308.210. Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971) (citation omitted).

Burden of proof requires that the party seeking relief (Plaintiffs in this case) provide evidence to support their position (value). The evidence that a plaintiff provides must be competent evidence of the requested real market value of the property in order to sustain the burden of proof. *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing [features or characteristics], and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Betz Evans Associates v. Lane County Assessor*, TC-MD 110329C, WL 4714961 at *3 (Oct 4, 2012); *Toy Box Maxi-Storage LLC v. Jackson County Assessor*, TC-MD 110339C, WL 1958943 at *3 (May 31, 2012); *see also Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005).

There are three standard methods of valuation for determining real market value, as prescribed by statute and administrative rule. ORS 308.205(2) states that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The department's rule prescribes the following three methods of valuation: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept. of Rev. (Allen)*, 17 OTR 248, 252 (2003). The administrative rule requires that consideration be given to the three approaches to value (income, cost, and sales comparison), but they need not all be used. OAR 150-308.205-(A)(2)(a); *see also Allen*, 17 OTR at 252; Gangle *v. Dept. of Rev.*, 13 OTR 343, 345 (1995). The valuation approach or approaches to be used is "a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

/ / /

Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

C.     *The Court's Analysis of the Evidence*

Bearing in mind that Plaintiffs have the burden of proof to establish an error in the record assessment, the court finds it unnecessary to go into extensive detail about the parties' respective appraisals and testimony. Both appraisers have problems with their valuation evidence.

1.     *Plaintiffs' Evidence - Tax Year 2011-12*

Looking first at Plaintiffs' evidence for the 2011-12 tax year, the court notes that all four properties were either short sales or bank (REO) sales. (Ptfs' Ex 1 at 13.) Phinney adjusted three of the four comparables by $26,250 (comparable 2), $22,375 (comparable 3), and $16,750 (comparable 4). (*Id.*) The court is also troubled by the magnitude of the adjustments that Phinney applied to comparables 2 through 4. Comparable 2 has total negative adjustments of $247,363, comparable 3 has positive adjustments totaling $161,775, and comparable 4 has positive adjustments of $195,545. Those adjustments are significant when compared to the unadjusted sale prices of $525,000, $447,500, and $335,000, respectively, for comparables 2 through 4. (*Id.*) They amount to adjustments of approximately 36 percent (comparable 3), 47 percent (comparable 2), and 59 percent (comparable 4). (*See Agripac, Inc. v. Dept. of Rev.*, 11 OTR 371, 376 (1990) (Defendant made adjustments amounting to between 44 percent and 70 percent of the sale prices and the court found that "[s]uch large adjustments make any comparisons unreliable."). Plaintiffs' adjustments in this case are close to that magnitude, and are significant enough to be troubling to the court. Plaintiffs' sales were, admittedly, offset by correspondingly high adjustments on the other side of the ledger (comparable 2 having positive

adjustments totaling $179,150, comparable 3 having negative adjustments totaling $149,702, and comparable 4 having negative adjustments totaling $86,525). Thus, although Plaintiffs' overall net adjustments are not too significant for three of the four comparable sales (comparable 4 being the exception, with total net adjustments of $109,020 compared to a sale price of $335,000), the magnitude of the adjustments leads the court to conclude that those sales are not truly comparable. Both parties acknowledged the difficulty in finding "good" comparables, and their evidence bears that out.

Looking more closely at the evidence, Phinney made a total of 13 individual adjustments exceeding $40,000 to the four "comparable" sales, with two adjustments of negative $156,300 and negative $133,125 (to comparables 2 and 3). (Ptfs' Ex 1 at 13.)

Phinney testified that, in his professional opinion, comparable 3 was his best comparable. That property was a bank sale of a 4,942-square-foot home on 0.69 acre, which had a $50,700 adjustment for the difference in lot size, a $22,375 adjustment for the bank influence, a negative adjustment of $133,125 for the difference in the size of the total above grade living space, a $50,700 adjustment for the lack of any below grade living space (whereas the subject property has 2,535 square feet of finished below grade living space), and a $35,000 adjustment for lesser "outdoor features," identified in the report as "pool/water fea." (*Id.*) With total negative adjustments of $149,702 and total positive adjustments of $161,775, applied to a property sold by a bank for $447,500, the court rejects Phinney's opinion that comparable 3 is the best comparable. More accurately, the court finds that sale to not be truly comparable, as it does the other three sales included in Plaintiffs' appraisal as comparable sales. Additionally, Phinney's comparable 3 was sold "as is," and was on the market for only 45 days before the bank sold it.

/ / /

(Ptfs' Ex 1 at 10, 18.) Those factors collectively suggest that comparable 3 was a distressed sale and not indicative of the market.

The court is mindful of the fact that Phinney testified that short sales and "REOs" comprise up to 36 percent of sales, which he testified makes those sales "usable," but the court finds that not to be the case, given the fact that Defendant found 16 sales of homes that were neither short sales nor bank sales (including the sales Defendant used for tax year 2012-13). And, Phinney testified that both comparables 1 and 3 had small net adjustments, making them both good indicators of value, but that comparable 1 had a second home, which according to Cooper, was not actually the case. While Phinney relied on the MLS listing for that sale, which refers to both a pool house and "2ND RES[,]" Cooper testified that he spoke with the listing agent, and was told that the home had a pool house with a kitchen, but no second residence. That calls into question Phinney's negative $50,000 adjustment to comparable 1 because that home included a pool and living quarter-style pool house that included a kitchen, which is superior to the subject property's pool house.[5] Plaintiffs' appraisal report states the "the subject property enjoys about $50,000 in value from its outdoor structures," and that "adjustments were made based on the comparative value of the comparable sales outdoor structures[,] [which] can include a pool, pool house, shed, barn, corral, shop, tennis court, detached garage, water feature, second house, etc." (Ptfs' Ex 1 at 11.) It would seem that an adjustment of less than negative $50,000 would have been appropriate. That, of course, would have the effect of increasing the adjusted sale price above Phinney's $561,480 figure, and well above his $460,000 value conclusion for the 2011-12 tax year. Given that Phinney appears to have relied on the adjusted sale price of his

---

[5] Phinney's appraisal report simply refers to that structure as a pool house; Cooper's report states that there is a "pool house and full bath." (Ptf's Ex 1 at 6; Def's Ex A at 3.) There is no mention of a kitchen and the subject property's pool house and the bathroom look utilitarian; the quality being far less than the finish and condition of the subject's main residence.

comparable 3 in arriving at his final value conclusion (which had an adjusted sale price of $459,573), it appears to the court that a figure in excess of $561,480 (Phinney's adjusted sale price for his comparable 1) is supported by Plaintiffs' data. But, the court has already chronicled its concerns with Plaintiffs' appraisal evidence for the 2011-12 tax year, which renders Plaintiffs' value conclusion unpersuasive, even if adjusted by the court.

2.    *Plaintiffs' Evidence - Tax Year 2013-14*

Plaintiffs have similar problems with the 2013-14 tax year. Plaintiffs' comparable 1 has a single negative adjustment of $247,125 for its larger amount of above grade living space (6,462 square feet versus 3,167 square feet for the subject property), which amounts to 43 percent of the unadjusted sale price of $572,000. (Ptfs' Ex 1 at 15.) Plaintiffs' comparables 1 through 3 have numerous particularly large adjustments – eight in excess of $30,000. (*Id*.) Plaintiffs' best comparable (comparable 2) had practically offsetting adjustments of approximately 13 percent of the sale price, and the other three comparables had substantially larger adjustments on a percentage basis. Comparables 1 and 3 are particularly noteworthy in that comparable 1 had total negative adjustments of $276,125 and total positive adjustments of $192,364, and comparable 3 had total negative adjustments of $104,196 and total positive adjustments of $150,025, compared to sale prices of $572,000 for comparable 1 and $509,000 for comparable 3. (*Id*.) And, three of the four sales are considerably newer than the subject property, having been built in 2004 (comparable 1), 2003 (comparable 2), and 2005 (comparable 3). (*Id*.)

Additionally, all four of Plaintiffs' sale comparables for the 2013-14 tax year were on the market for relatively short periods of time, especially given Phinney's testimony about the poor economy and "distressed" housing market. Those comparables were on the market for 16 days, 50 days, 7 days, and 51 days, respectively, for comparables 1 through 4. (*Id*. at 24-27.)

Considering Phinney's testimony that typically homes sell between 30 and 180 days, the short amount of time that those properties were on the market suggests to the court that those sales were nontypical transactions, with buyers cashing in on deals made available by owners who appear to have been somewhat desperate to sell. Those homes are all very high-end properties and sold for between $83 per square foot (comparable 2) and $110 per square foot (comparable 4).[6] (*Id*. at 15.) Phinney identified those two properties as his best comparables and, notably, testified that comparable 2, which sold for $83 per square foot, the least amount of his four sales, was the best comparable and most indicative of the value of the subject property after adjustments. Phinney also acknowledged on cross-examination that he should have made a larger adjustment for the condition of his comparable 1, which he already adjusted upwards $57,200.

       3.     *Additional Comments Regarding Plaintiffs' Appraisal*

Looking at Plaintiffs' appraisal evidence for tax years 2011-12 and 2013-14, the court notes that, although Phinney asserted during closing argument that acreage (size of the lot) was not an important factor, he adjusted all of his comparable sales for differences in lot size, and four of the eight by more than $40,000 (comparables 2, 3, and 4 for the 2011-12 tax year and comparable 3 for the 2013-14 tax year). Plaintiffs have not presented properly adjusted comparable sales. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Mar 26, 2003) (ruling that under the sales comparison approach, the court looks at arm's length sales transactions of similar property to determine a correct real market value). "In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in

---

[6] The court calculated the per-square-foot prices based on total square footage and unadjusted sale price.

evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 at *3 (Apr 25, 2012).

Additionally, during the evidentiary portion of the trial, Phinney testified that he considered the size of the lot to be an important factor in terms of the selection of comparable sales (along with location). However, during closing argument, Phinney stated that overall living area was of primary importance, and that prospective buyers might or might not want a lot of acreage, so acreage was "not as important." Phinney added that buyers of homes like the subject might want to be located in a gated community (the subject is not in such a community). Those statements are conflicting and cause the court to question the reliability of Plaintiffs' appraisal.

The court could discuss additional concerns it has with Plaintiffs' appraisal, but finds the above-mentioned problems sufficient to support its conclusion that Plaintiffs' evidence does not establish by a preponderance of the evidence that the values on the rolls for tax years 2011-12 and 2013-14 are more likely than not in error. And the court lacks jurisdiction to consider tax year 2012-13.

4.     *Defendant's Evidence*

To begin with, Defendant has requested that the court sustain the current roll values of $699,791 for the 2011-12 tax year and $704,868 for the 2013-14 tax year, and that the court dismiss Plaintiffs' appeal for tax year 2012-13 for failure to meet the statutorily required allegation of a minimum 20 percent error in the value of the subject property as required by ORS 305.288(1)(b).

Additionally, there are problems with Defendant's appraisal. Defendant found it necessary to make 15 individual adjustments to its six comparable sales for the 2011-12 tax year in excess of $40,000 each. (Def's Ex A at 4.) All of the comparable sales are considerably

smaller than the subject property, ranging in size from a low of 2,168 square feet (comparable 5) to a high of 4,157 square feet (comparable 4), and three of the homes are under 3,000 square feet, whereas the subject property is 5,702 square feet. Two of Defendant's adjustments exceed $70,000; one being for the difference in square footage between the subject property and comparable 2, and the other for the difference in quality between the subject property and comparable 6, with the latter being deemed superior and receiving a negative $76,000 adjustment. (*Id*.) Cooper testified on direct that it was difficult to find comparables. The comparables chosen by the parties certainly seem to support that testimony.

As for the 2013-14 tax year, five of the six comparable sales are on considerably smaller lots, ranging in size from a low of 1 acre to a high of 2.96 acres compared to the subject property's 5.76 acres. (Def's Ex G at 4.) As with the 2011-12 tax year, Defendant found it necessary to make sizable adjustments for a number of differences between the comparable sales and the subject property. Cooper applied 11 adjustments in excess of $50,000 for sales of homes of between $507,000 and $730,000. (*Id*.) And, Cooper made seven other adjustments that are between $30,000 and $50,000. (*Id*.) Finally, four of the six comparable sales are post-assessment date transactions. (*Id*.)

5.      *Reconciliation*

Although the court, under ORS 305.412, "has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties," the court finds the evidence in this case insufficient to determine a value for the subject property for either tax year 2011-12 or 2013-14. In addition, as indicated above, Plaintiffs have not alleged an error in value of at least 20 percent (nor alleged good and

/ / /

sufficient cause) for the 2012-13 tax year, which leaves the court without court jurisdiction to consider that tax year.

### III. CONCLUSION

After careful consideration of the evidence before it, the court concludes that Plaintiffs' appeal must be denied for the 2011-12 and 2013-14 tax years and dismissed for the 2012-13 tax year. Plaintiffs failed to establish by a preponderance of the evidence that there was an error in the real market value of the subject property, identified as Account 00131075, for tax years 2011-12 and 2013-14. Plaintiffs' appeal for tax year 2012-13 is dismissed for lack of jurisdiction, Plaintiffs having failed to allege an error in value of at least 20 percent, as required by ORS 305.288(1)(b). Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal of property identified as Account 00131075 is denied for the 2011-12 and 2013-14 tax years.

IT IS FURTHER DECIDED that Plaintiffs' appeal is dismissed for the 2012-13 tax year.

Dated this ____ day of February 2015.

_____
DAN ROBINSON
MAGISTRATE


*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Dan Robinson on February 24, 2015. The court filed and entered this document on February 24, 2015.*